# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SHEILA HIRSCH MARKOWITZ,

        Plaintiff,

     v.                             Case No. 06-C-1153

MILLER BREWING COMPANY,

        Defendant.

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. PROCEDURAL BACKGROUND

      This action was commenced on May 25, 2006, when the plaintiff, Sheila Hirsch Markowitz ("Markowitz"),[1] filed this action in the 150th Judicial District of Bexar County, Texas under Chapter 21 of the Texas Labor Code, Section 21.001 *et seq.*, as amended, to correct unlawful employment practices on the basis of gender. Thereafter, on June 23, 2006, the defendant, Miller Brewing Company ("Miller"), removed the action to the Western District of Texas, San Antonio Division. Miller then, on July 13, 2006, moved to transfer the action's venue to the Eastern District of Wisconsin, which motion was granted by the court in the Western District of Texas.

      The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity) because Markowitz is a citizen of the State of Maryland, Miller is a citizen of the State of Wisconsin, and the amount in controversy exceeds $75,000. Further, the action was properly removed from state to

---

[1] In the parties' submissions, the plaintiff is referred to as both "Hirsch," her maiden name and the name used by the plaintiff while employed at Miller, and "Markowitz," married name and the name used in her submissions to the court. For the sake of consistency, the court will refer to the plaintiff as "Markowitz" throughout its decision and order.

federal court pursuant to 28 U.S.C. § 1441. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(a)(1) because this is the district where the defendant resides.

On January 11, 2008, in accordance with the scheduling order previously issued by the court, the defendant filed a motion for summary judgment. That motion has now been fully briefed and is ready for resolution.

## II. FACTUAL BACKGROUND

In accordance with the relevant provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendant's motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the plaintiff's response to the defendant's motion for summary judgment contained responses to the defendant's proposed findings of fact, as well as some additional proposed findings of fact. The defendant provided responses to the plaintiff's additional proposed findings of fact with its reply brief. A review of the parties' respective proposed findings and the responses thereto reveal that the following are material and (except where noted) undisputed facts that are relevant to the disposition of the defendant's motion for summary judgment.[2]

On January 15, 1996, Miller hired Markowitz as an On-Premise Chain Account Manager ("CAM") based in Houston, Texas. (Defendant's Proposed Findings of Fact ("DPFOF") ¶¶ 7-8.) In 1998, Markowitz received a lateral promotion to Off-Premise CAM based in San Antonio, Texas.

---

[2] Throughout her responses to the defendant's proposed findings of fact, Markowitz attempts to deny the substance of many of Miller's proposed findings, but does so without citing to evidence on the record. For instance, Markowitz responds, "Admit that [witness] testified to this fact. Deny the substance of the fact" (*see* Resp. to DPFOF ¶¶ 43-50, 54-56, 59, 60) or "Admit to testimony. Deny that any other evidence supports this claim" (*see* Resp. to DPFOF ¶¶ 133-34). However, Markowitz often does not provide the court with citations to evidence on the record that would place Miller's proposed findings in dispute. Civil L.R. 56.2(b) (E.D. Wis.) states that "[t]he response [to the movant's proposed findings of fact] . . . must include specific citations to evidentiary materials in the record which support the claim that a dispute exists." To the extent that Markowitz denies the truth of a particular fact set forth by Miller, but fails to provide the court with specific citations to evidence on the record in support of her denial, the court must accept Miller's proposed findings of fact as true for the purpose of this motion. *See* Civil L.R. 56.2(e)

2

(DPFOF ¶ 9; Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 2.)  In January 2000, Miller promoted Markowitz to On-Premise National Accounts Manager ("NAM"),[3] and, at some point thereafter, Miller began working out of her home in San Antonio, Texas.  (DPFOF ¶¶ 10, 16.)  As a NAM, Markowitz was responsible for calling on the buyers of a number of accounts to make sure that Miller had certain volume distribution and programming.  (DPFOF ¶ 11.)  Markowitz traveled extensively as a NAM, often three out of every four weeks, attending meetings and buyer calls. (DPFOF ¶ 13; PPFOF ¶¶ 5-6.)

David Colletti ("Colletti") (male), Senior Director of National On-Premise Accounts and Strategy, became Markowitz's supervisor when she began working as a NAM.  (DPFOF ¶¶ 17, 19.) Colletti worked out of Miller's offices in Milwaukee during the time he supervised Markowitz. (DPFOF ¶ 18.)  Colletti remained Markowitz's supervisor until her employment ended on April 27, 2005, and the two had monthly one-on-one discussions from mid-2003 through February 2005. (DPFOF ¶¶ 21, 23.)

Colletti reported to Regenia Stein ("Stein") (female), Vice President of National Accounts and Sales Planning. (DPFOF ¶¶ 22, 41.)  Stein was responsible for National/Strategic Accounts. (DPFOF ¶ 40.)  She reviewed the organizational structure, business process, go-to-market approach, and determined the appropriate course of action within National Accounts.  (DPFOF ¶ 42.)

SAB purchased Miller Brewing Company in approximately July 2002.  (DPFOF ¶ 35.)  Stein testified during her deposition that in approximately spring 2003, Miller undertook a discussion of its organizational structure.[4]  (DPFOF ¶ 36.)  She further testified that the reasons for the discussion

---

[3] The job title of NAM was later re-named Strategic Accounts Manager ("SAM").  Miller uses the acronyms NAM and SAM synonymously as reflecting the same function but with a different name. (PPFOF ¶ 7.)  The court will do the same.

[4] Markowitz objects to the admission of Stein's deposition testimony regarding the content of these senior level discussions as hearsay.  (*See* Resp. to DPFOF ¶¶ 36-39.)

were the purchase by SAB, the desire to improve the business process, the new business strategies of new senior leadership, and the detachment (sale) from Altria (formerly known as Philip Morris). (DPFOF ¶ 37.) She testified that one of the new business strategies was to place greater emphasis on select classes of trade that Miller's strategy defined as important and another strategy was the importance of the local market and Miller's connectivity to the local market from a company perspective. (DPFOF ¶¶ 38-39.)

Stein further testified at her deposition that no one on her staff, including Colletti, participated in these senior level discussions. (DPFOF ¶ 43.) She testified that an overarching strategy for National Accounts was to place account representation as close to the customer(s) and/or distributor(s), as possible, and that locating NAMs in the market was important. (DPFOF ¶¶ 44-45.) According to Stein, the On-Premise relationship is very local, and the distributor, the account person, and the market area people locally and collaboratively managed the business; according to Stein, a NAM's presence in the local market helped Miller by being visible to the customer and the distributor. (DPFOF ¶¶ 46-47.) The hoped-for strategy outcome, according to Stein, was enhanced business results. (DPFOF ¶ 48.) Stein's approach was to leave existing SAMs where they were

"[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). Fed. R. Civ. P. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted."

The court does not find Stein's testimony to be hearsay in that it is not being admitted to prove the truth of the matter asserted. Stein's testimony is not being accepted to prove that Miller was undergoing a restructure of its business strategies or to prove any policy that may have emerged as a result of such a restructure. Instead, the court admits Stein's testimony for the limited purpose of demonstrating Stein's state of mind, as the decision maker, during the relevant time period. Admitting Stein's testimony for such a purpose does not run afoul of the hearsay rule. *See* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 801.11[5][b] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2008) ("Testimony is not hearsay if it is offered only to show the context within which the parties had been acting, or to show a party's motive or intent for behavior.").

4

located, but to migrate new SAMs over time if it was required to obtain the desired strategic outcome. (DPFOF ¶ 49.)

On March 12, 2004, Markowitz told Colletti that she and her boyfriend were moving toward an engagement to be married and asked if she could move her home office from San Antonio, Texas, to Maryland. (DPFOF ¶¶ 74-75; PPFOF ¶ 10.) Colletti told her he was 99% certain she could transfer her home office to Maryland. (DPFOF ¶ 76; PPFOF ¶ 11.) Subsequently, Markowitz became engaged in April 2004 and informed Colletti of the engagement on April 26, 2004. (DPFOF ¶¶ 77-78.) Sometime thereafter Stein was informed of Markowitz's transfer request. (DPFOF ¶ 79; Resp. to DPFOF ¶ 79.)

On April 24, 2004, Markowitz underwent psychometric assessment. (DPFOF ¶ 82.) Miller used psychometric testing to enhance the selection process and development of employees. (DPFOF ¶ 83.)

On April 28, 2004, Markowitz received her year-end evaluation and was rated by Colletti as "Individual performance achieved, meeting customer/goal requirements on all occasions." (DPFOF ¶ 80.) Markowitz signed the evaluation on April 28, 2004. (DPFOF ¶ 81.)

On July 15, 2004, Colletti asked Markowitz if she would still get married if he could not transfer her to Maryland. He said he was checking to see if she loved her fiancé, asked her not to take it the wrong way, and said he "crossed the line." (DPFOF ¶ 92.)

On August 25, 2004, Markowitz asked Colletti to meet with Applebees in September, and he said he was unavailable until January 2005. (DPFOF ¶ 84.) However, Colletti asked Phil Blavat, a director in Strategic Accounts who reported to Colletti, to assist Markowitz with Applebees. (DPFOF ¶¶ 85-86.) Blavat had previously supervised the person who worked the Applebees account and went on calls to Applebees. (DPFOF ¶ 87.)

5

In August and September 2004, Markowitz advised Colletti of ongoing issues with the Fosters brand at the TGI Fridays account. (DPFOF ¶ 88.) Colletti asserts he made phone calls to assist Markowitz at that time since he was familiar with the account. (DPFOF ¶ 89; Colletti Aff. ¶ 8.) However, Markowitz testified during her deposition that she was not aware of any calls that Colletti claims to have made to the executives for TGI Fridays. (Resp. to DPFOF ¶ 89; Ex. A at 93.) In around September 2004, Markowitz asked Colletti to review a letter she wrote to the President of TGI Fridays restaurant. She claims he did not do so. (DPFOF ¶ 90.)

On September 24, 2004, in a one-on-one meeting, Colletti told Markowitz she was giving him only 60% job effort since her dad died. (DPFOF ¶ 93.) On that same date, Colletti told Markowitz that she was not missed at the staff meeting because she tends to dominate and ask too many questions. (PPFOF ¶ 53.)

On October 12, 2004, during a staff meeting, Colletti said, "We need to get on that like a raped date." (PPFOF ¶ 47.)

On October 13, 2004, Colletti and Markowitz met and discussed her mid-year evaluation. (DPFOF ¶¶ 103-04.) Markowitz was rated as "Individual performance generally achieved, with a few occasions of partially meeting goals/customer requirements." (DPFOF ¶ 105.) Her areas for future focus and/or development included continuing to work on reducing her editorial comments to key facts. (DPFOF ¶ 106.) Markowitz signed the mid-year evaluation on October 20, 2004. (DPFOF ¶ 107.)

Also on October 13, 2004, Colletti told Markowitz she was insecure, reviewed his notes from his meeting with the staff psychologist regarding her psychometric assessment, showed her a graph that indicated weaknesses in her personality, and told her she had a B-plus intelligence. (DPFOF ¶ 96.) Jim Kallies, a SAM, told Markowitz that Colletti also commented on his intelligence when

6

discussing Kallies' psychometric test results. (DPFOF ¶ 97.) Markowitz has no information on how Colletti handled other employees' psychometric results. (DPFOF ¶ 98.)

During the October 13, 2004 meeting, Colletti and Markowitz discussed Markowitz's request to transfer her home office to Maryland. (DPFOF ¶ 109.) Markowitz provided Colletti with a written memo confirming her transfer request and containing a travel cost comparison. The memo requested Miller provide her with a timeline for the move. (DPFOF ¶ 110; PPFOF ¶ 13.) Colletti asserts that, at some point during the October 13th meeting, he told Markowitz that she could post for any open positions in the market in which she wanted to work. (DPFOF ¶ 111; Colletti Aff. ¶ 13.) Markowitz asserts that she does not recall Colletti telling her that. (Resp. to DPFOF ¶ 111; Ex. 1 at 76.)

Sometime in 2004, the distributors reported that they were unhappy with Markowitz's lack of presence in the Texas market. (DPFOF ¶ 117.) Stein instructed Colletti to resolve the problem and improve Markowitz's communication in the Texas market area. (DPFOF ¶ 118.) Markowitz admits that in December 2004, at least one Texas distributor criticized how information was coming from her. (DPFOF ¶¶ 119-20.) Colletti asked Paul Edwards, another SAM, to go down to the Texas market area and share best practices regarding communication.[5] (DPFOF ¶ 121.)

_____

[5] Markowitz objects to the admissibility of many of these particular facts as hearsay. (Resp. to DPFOF ¶¶ 117-19, 120-21.)

"[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt*, 113 F.3d at 742. Fed. R. Civ. P. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted."

Because the court does not accept the facts into evidence for their truth, but instead as circumstantial evidence of Stein's and Colletti's state of mind at the time in question, the court will admit the facts into evidence. *See* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 801.11[5][b] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2008) ("Testimony is not hearsay if it is offered only to show the context within which the parties had been acting, or to show a party's motive or intent for behavior.").

In their December 2004 one-on-one meeting, Colletti told Markowitz he wanted to discuss the Texas distributors' feedback. (DPFOF ¶ 123.) Colletti told Markowitz that the Texas distributors' comments were a reflection on her. (DPFOF ¶ 124.) Markowitz claims Colletti told her in this meeting that he did not think he could transfer her with this "shit" going on and then stared at her. (DPFOF ¶ 126.)

In December 2004, Markowitz asked Colletti about the status of her relocation. (DPFOF ¶ 127.) She claims that Colletti told her the relocation issue was "a bigger pain in the ass for me than it is for you" and that he would get back to her in the first two weeks in January 2005. (DPFOF ¶ 128; Resp. to DPFOF ¶ 128.)

In 2004-05, Markowitz's Strategic Accounts were as follows:[6]

(a)     Applebees in Kansas City, Kansas

(b)     Brinker Int'l in Dallas, Texas

(c)     Dave & Busters in Dallas, Texas

(d)     S&A Rest Corp of America in Dallas, Texas

(e)     TGI Fridays in Dallas, Texas

(f)     Tony Roma's in Dallas, Texas

(g)     Total Entertainment in Dallas, Texas

---

[6] Markowitz admits that these were her accounts from 2004-05. However, she objects to the admissibility of Exhibit 1001, which was submitted to the court by Miller in support of this particular proposed finding of fact. Markowitz objects to the exhibit's admissibility pursuant to Fed. R. Evid. 1006 because "the originals from which Exhibit 1001 was compiled were never made available to the Plaintiff." (Resp. to DPFOF ¶ 129.) Because Markowitz testified during her deposition that these were her accounts during that period, because that deposition testimony is in evidence before the court on motion for summary judgment, and because that testimony is provided as additional evidence in support of this particular finding of fact, the court need not rule upon the admissibility of Exhibit 1001 at this time. (*See* Ex. A at 29-31.)

(DPFOF ¶ 129.)  Markowitz had to travel to call on these accounts.  (DPFOF ¶ 130.)  She also had to visit Landry's in Houston, Texas and Morton's in Palm Beach, Florida to maintain those relationships with Miller, although they were not considered part of her volume.  (DPFOF ¶ 131.)

Colletti said at least twice in 2005 that he was not getting enough sex from his wife.  (DPFOF ¶ 99.)  The parties dispute exactly how many times Colletti may have made such statements.  (Resp. DPFOF ¶ 99.)

Markowitz did not interpret any of Colletti's actions or conduct as romantic interest in her.  (DPFOF ¶ 102.)

On January 26, 2005, Markowitz prepared a memorandum to Colletti requesting an update on her request for a transfer.  (DPFOF ¶ 132.)  Colletti discussed Markowitz's request with Stein.  (DPFOF ¶ 133.)  Stein decided to deny Markowitz's request for a transfer.  (DPFOF ¶ 134.)  Stein's reasons were that Markowitz had no accounts in Maryland, there was no job opening in Strategic Accounts in the Maryland market, there was no business opportunity or business need driving the transfer, and there was no way to fund it. (DPFOF ¶ 135; Stein Aff. ¶ 8.)  Colletti also wanted Markowitz to remain in Texas.  (DPFOF ¶ 136; Resp. to DPFOF ¶ 136; Ex. C at 64.)  Colletti concluded that Markowitz's transfer moved her away from her accounts, which was inconsistent with Strategic Account's philosophy to get SAMs closer to their accounts   (DPFOF ¶ 137; Ex. C at 64-66.)

On February 4, 2005, Colletti told Markowitz that Miller was denying her request for a transfer. (DPFOF ¶ 138; PPFOF ¶ 17.)  Colletti stated that the department was moving SAMs toward their business, that it did not make sense for her to work her accounts from Maryland instead of Texas, and that there was no open SAM job in Maryland. (DPFOF ¶¶ 139-41.)

In February 2005, Colletti told Markowitz about interest in her for a CAM job in Virginia. (DPFOF ¶ 144.) Sometime thereafter, Colletti told Markowitz the range for the salary and incentive compensation for the CAM job was similar to her current job. (DPFOF ¶ 145; Resp. to DPFOF ¶ 145.) Colletti asserts that Markowitz informed him that she did not want to apply for the job. (DPFOF ¶ 146; Colletti Aff. ¶ 15.) However, Markowitz asserts that she did not know applying for the job was an option at that time. (Resp. to DPFOF ¶ 147; Markowitz Dep. at 79-80.) On February 16, 2005, Markowitz e-mailed Colletti asking for a recap of the Virginia opportunity they discussed, including: grade level, pay scale, bonus percentage, reduction in pay, relocation dollars, and process for opportunity. She also asked that he send the recap in writing so that she could understand the situation fully. (DPFOF ¶ 147; Resp. to DPFOF ¶ 147.)

From March 2004 forward, Markowitz continued to seek a transfer to Maryland with Colletti as her supervisor. (DPFOF ¶ 148.) On March 16, 2005, Markowitz prepared a memorandum to Rochelle Jewell ("Jewell") complaining about Colletti. (DPFOF ¶ 149.) The memo complained about alleged comments by Colletti such as "if relocation won't work, will the wedding be off?," and the memo complained about lack of sensitivity to personal career concerns. Markowitz accused Colletti of not maintaining a positive work environment, an inability to communicate in a timely, professional, responsive manner, failure to recognize and evaluate employee issues, lack of sensitivity to listening to concerns, failing to keep employees informed, poor communication, failing to make himself available, failing to handle complaints quickly, and failing to create a climate for successful performance. (DPFOF ¶ 150; Ex. 1017.) She asked for one year severance, vacation pay and a bonus in exchange for a full release. (DPFOF ¶ 151; Ex. 1017.)

Jewell followed up on Markowitz's allegations. (DPFOF ¶ 154.) Jewell has a PHR (Professional in Human Resources) certification from the Society of Human Resource Management,

which requires at least two years of exempt human resources work and passing an examination. (DPFOF ¶ 155.)  In conducting her investigation, Jewell talked with Markowitz, Colletti, and Amy Brill Romano, the Human Resources manager who covered the area where the new CAM job was expected.[7]  (DPFOF ¶ 157.)  Jewell also reviewed documents (including Markowitz's personnel file) and  reviewed the locations of SAMs Paul Edwards and Ron Freeman (whom Markowitz alleged were granted transfer requests similar to hers).  (DPFOF ¶¶ 159-60; PPFOF ¶ 24.)

On April 5, 2005, Markowitz followed up on her internal complaint with Jewell because she had not heard from anyone regarding the investigation.  (PPFOF ¶ 28.)  Jewell prepared a memo to Markowitz, dated April 14, 2005, entitled Final Investigation Summary, (DPFOF ¶ 162, Ex. 1023), and on April 15, 2005, Jewell spoke to Markowitz and informed her of the results of her investigation. (DPFOF ¶ 163.)  Jewell found no evidence of inappropriate management by Colletti regarding Markowitz's request for relocation, no evidence of a change in tone to Markowitz's and Colletti's relationship, no evidence of inappropriate conversations, and found that Colletti identified a comparable opportunity for Markowitz.  (DPFOF ¶ 162.)

Jewell told Colletti that he needed to apologize to his staff at a meeting because something he said was misheard, not appropriate for a staff meeting, and should be addressed.  (DPFOF ¶ 164.)  On April 19, 2005, Colletti said at a staff meeting that he wanted to apologize for anything he may have said publicly or in private that may have offended or made some feel uncomfortable, and/or afraid, and if anyone wanted to discuss the situation, to contact him or Rochelle Jewell.  (DPFOF ¶ 165; Ex. 8.)  Colletti did not recall saying "rape date" in a staff meeting.  (DPFOF ¶ 166.)

---

[7]  The plaintiff asserts that Jewell only interviewed Colletti and Markowitz in conducting her investigation and further argues that the defendant's citations to the record do not support that Jewell interviewed Romano.  After reviewing the defendant's citations, the court finds that the noted deposition testimony supports the defendant's contention that Jewell interviewed all three individuals. Further, the plaintiff fails to cite evidence on the record to the contrary as required by Civil L.R. 56.2(a)(1).  Accordingly, the court accepts the fact as true.

On or shortly after April 18, 2005, Markowitz spoke with Jewell about the CAM job in the Virginia market, including the possibility of Markowitz interviewing for the job. (DPFOF ¶ 168.) Jewell told her she had to apply for the job. (DPFOF ¶ 169.) On April 25, 2005, Jewell told Markowitz that the CAM job was now part of the North Atlantic region and that she should contact Terry Butler. (DPFOF ¶¶ 171-72.) Jewell told Markowitz she had to go into the Miller intranet to apply. (DPFOF ¶ 173.) At that time, Jewell also told Markowitz that if she moved, her current job position would stay in Texas. (DPFOF ¶ 175.)

On April 26, 2005, Colletti and Jewell called Markowitz and indicated that they needed to complete her year-end review. (PPFOF ¶ 30.) In the afternoon of April 26, 2005, Jewell and Colletti talked with Markowitz over the telephone about her year-end rating. (DPFOF ¶ 185.) Markowitz was rated as "Individual performance generally achieved, with a few occasions of partially meeting goals/customer requirements." (DPFOF ¶ 186.) Jewell also told Markowitz that Miller had no plans to have SAMs based in Maryland. (DPFOF ¶ 176.)

In a separate conversation on April 26, 2005, Jewell and Stein talked with Markowitz. (DPFOF ¶ 177.) Stein indicated that if Markowitz moved to Maryland, Miller considered that a resignation. (DPFOF ¶ 178.) Additionally, she stated that there was no National Accounts job in Maryland, that San Antonio was close to the customer in a practical way, and that since August 2003, Miller was trying to get as close to the customer as possible. (DPFOF ¶¶ 179-81.) Stein urged Markowitz to apply for another position. (DPFOF ¶ 182.)

On April 26, 2005, Markowitz applied for a CAM position in Virginia. (DPFOF ¶ 183.) She received a confirmation e-mail stating, "We will review your qualifications, experience, work history and contact you if you are a potential candidate for the open position." (PPFOF ¶ 36.) Markowitz

was never contacted about the position following submission of her application. (DPFOF ¶ 184; PPFOF ¶ 37.)

Markowitz's last day of employment at Miller was April 27, 2005. (DPFOF ¶ 188.) On that day, Markowitz received a letter from Jewell purporting to be an acceptance of her resignation from Miller. (PPFOF ¶ 33.) The letter stated that Markowitz resigned due to her desire to relocate. (DPFOF ¶ 190.)

Miller contends that on April 28, 2005, the SAM job that Markowitz had been performing for Miller until April 27, 2005 was available and open to Markowitz. (DPFOF ¶ 191.) Markowitz argues that the position was not open to her because she was moving to Maryland. (Resp. to DPFOF ¶ 191.)

At the end of April 2005, Markowitz moved from San Antonio to Maryland. (DPFOF ¶ 192.) She married Barry Markowitz on June 26, 2005. (DPFOF ¶ 193.)

Miller hired Doreen McCarthy ("McCarthy") (female) to replace Markowitz. (DPFOF ¶ 198.) McCarthy is based in Dallas, Texas. (DPFOF ¶ 199.)

Markowitz filed her EEOC charge on April 19, 2005. (DPFOF ¶ 200.) Her charge addressed the denial of her request to transfer and Miller's transfer of a similarly situated male who wanted to relocate. (DPFOF ¶ 201.) Markowitz amended her charge on May 10, 2005. (DPFOF ¶ 202.) The amendment addresses how Markowitz's employment with Miller ended and whether she resigned or was discharged. (DPFOF ¶ 203.)

### III. SUMMARY JUDGMENT STANDARDS

A district court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than

14

'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932

(7th Cir. 2001) (quoting *Johnson v. Univ. of Wis.-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). "A

mere scintilla of evidence in support of the nonmovant's position is insufficient." *Id.* (citing

*Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### IV. DISCUSSION

Markowitz's complaint asserts the following claims against Miller:

5.1    Defendants intentionally engaged in an unlawful employment practice because of [Markowitz's] gender; that the Defendants intentionally discriminated against Plaintiff in connection with the compensation, terms, conditions and privileges of employment in violation of the Texas Labor Code.

5.2    Defendants intentionally discriminated against Plaintiff in a manner that deprived her of an equal employment opportunity to that provided to similarly-situated male employees, in violation of Chapter 21 of the Texas Labor Code.

5.3    Plaintiff alleges that Defendant discriminated against Plaintiff on the basis of her sex, female, with malice or with reckless indifference to the state-protected rights of Plaintiff.

5.4    Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and this action for permanent injunction and other relief is her only means of securing adequate relief.  Plaintiff is suffering and will continue to suffer irreparable injury from the Defendants [sic] actions as stated above.

(Compl. 6.)

In its motion for summary judgment, Miller alleges that: (1) "Markowitz's failure to transfer

claim should be dismissed because she cannot demonstrate that Miller treated non-protected similarly

situated employees any differently and that Miller's legitimate, non-discriminatory reasons for not

transferring her were a pretext for sex discrimination"; (2) "Markowitz's discharge claim should be dismissed because she cannot show that Miller subjected her to an adverse action because she quit her employment"; (3) "Markowitz's hostile environment claim should be dismissed because Markowitz failed to raise it in her EEOC charge and amended charge, which is a prerequisite to suing in court. Markowitz also cannot show that she was subjected to any comments because of her sex that were severe and pervasive enough to create an abusive environment to a reasonable person"; and (4) "[E]ven if Markowitz could show harassment, the affirmative defense bars liability. Miller took reasonable care to prevent and correct any harassment and Markowitz unreasonably failed to report any alleged conduct." (Mot. 1-2.) Therefore, "Miller requests dismissal of the complaint with prejudice, costs, and any other relief the Court deems appropriate." (Mot. 2.)

In her response brief, "Markowitz concedes that hostile work environment based upon her gender, for purposes of this opposition, is not classically so severe or pervasive as to Colletti's actions to be sufficient to support such a claim." (Resp. 21.) Accordingly, to the extent that Markowitz pled hostile work environment in the complaint, the court will grant Miller's motion to dismiss that claim. Because the court will grant Miller's motion in the first instance, it need not address the merits of Miller's affirmative defense.

After construing all of the facts in the light most favorable to the non-movant, Markowitz, as the court must do when considering a motion for summary judgment, the court finds that the evidence demonstrates that Markowitz cannot establish a prima facie case of gender discrimination with respect to either her failure to transfer claim or her discharge claim. Accordingly, for the reasons which follow, Miller's motion for summary judgment with respect to her failure to transfer and discharge claims will be granted.

Markowitz alleges intentional discrimination by Miller, i.e., gender discrimination, in both denying her request to transfer from her home office in San Antonio, Texas to an office in Maryland and in allegedly terminating her employment, in violation of the Texas Commission on Human Rights Act, as codified in § 21.051 of the Texas Labor Code. The Texas Commission on Human Rights Act prohibits discrimination in employment based on sex. TEX. LAB. CODE § 21.051. Because the Texas statute tracks its federal counterpart in Title VII of Chapter 42 of the United States Code, the court may consider analogous federal case law in interpreting and applying § 21.051. *Romo v. Texas Dep't of Transp.*, 48 S.W.3d 265, 269 (Tex. Ct. App. 2001).

A plaintiff may prove employment discrimination under Title VII using either the "direct method" or "indirect method." Markowitz first attempts to establish her discrimination claims using the direct method of proof. (Resp. at 14-16.) The court does not find her attempt persuasive.

In *Curutti v. BASF Corp.*, the Seventh Circuit Court of Appeals summarized the direct method of proof:

> Under the direct method of proof, a plaintiff may show, by way of direct or circumstantial evidence, that his employer's decision to take an adverse job action against him was motivated by an impermissible purpose, such as race, national origin, or age. Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. In short, "direct evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" A plaintiff can also prevail under the direct method of proof by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decision maker." That circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action."

349 F.3d 1055, 1061 (7th Cir. 2003) (internal citations omitted).

Markowitz asserts that the following facts establish a "pattern of personal, sexist, misogamist and abusive comments by Colletti" and thereby provide circumstantial evidence of discrimination under the direct method of proof:

17

(1)     evaluating [Markowitz's] performance with comments as to her aggressive conduct in meetings by asking too many questions;

(2)     asking whether Markowitz would marry her fiancé if Miller denied her transfer request;

(3)     as her boss by refusing and failing to assist her in servicing her accounts;

(4)     telling her that she had only been "giving him" 60% effort after the previous death of her father;

(5)     that she had "not been missed" in staff meetings;

(6)     by failing to explain his criticisms of claimed deficiencies in her performance;

(7)     on October 12th, Colletti began the meeting by telling staff to "get on this like a raped date" with regard to one of the staff goals;

(8)     on November 9, 2004 during a staff meeting, Colletti again used the term "rape date["];

(9)     privately, in his assessment of Plaintiff, by saying she was "insecure";

(10)    making negative comments concerning his perception of her personality;

(11)    referring to a confidential psychological test used by Miller to which he should not have been privy;

(12)    telling her that her request was a "pain in the ass" for him;

(13)    claiming that Miller customers had purportedly complained about her (but never supporting the allegations by way of documentation) which would negatively impact her;

(14)    threatening Markowitz's job by telling her that he didn't think he could transfer her with "shit like this going on";

(15)    refusing to interact with her for periods of time in 2005, leading up to her termination from Miller; and

(16)    evaluating her negatively upon her termination from Miller.

(Resp. at 15-16.)

Even assuming that the above facts are true and undisputed (and Miller does dispute many of them), the court does not find that such facts amount to "an admission by the decision-maker that his actions were based upon the prohibited animus" nor do they construct "a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision maker.'" *See Cerutti*, 349 F.3d at 1061. Most notably, the facts listed by Markowitz all relate to conduct undertaken solely by Colletti, who was not the decision maker in this case. It was Stein, not Colletti, who ultimately decided whether Markowitz's request for a transfer would be granted. And Markowitz provides the court with no evidence that points to gender discrimination by Stein. (DPFOF ¶ 135.) Further, even if Colletti had been the decision maker, with the single exception of comments that Colletti may have made in regards to "rape date," none of the facts asserted by the plaintiff point to any sort of gender animus on Miller's behalf. And even Colletti's admittedly crude comments on "rape date" appear to the court as two isolated incidents that do not amount to a "'convincing a mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision maker.'" *See Curutti*, 349 F.3d at 1061 (citations omitted). In short, the court does not find that Markowitz can establish gender discrimination in her employment based on the direct method of proof.

Because Markowitz cannot prevail under the direct method of proof, she must proceed under the indirect method, i.e., the familiar *McDonnell Douglas* framework. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973). To establish a discrimination claim under the indirect method, Markowitz has the initial burden of proving a prima face case that (1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employers' legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4)

similarly situated employees outside of her protected class were treated more favorably by the employer. *Ptasznik v. St. Joseph's Hospital*, 464 F.3d 691, 696 (7th Cir. 2006).

If a prima facie case is established, Markowitz is entitled to a presumption of discrimination. *See Romo*, 48 S.W.3d at 270 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)). Then, the burden shifts to Miller to present evidence of a legitimate, non-discriminatory reason for its action. *See id*. If Miller articulates a legitimate, non-discriminatory reason for its actions, any presumption of discrimination disappears and the burden shifts back to Markowitz to prove that Miller's articulated reason is merely a pretext to discrimination. *See id*. "Even though the burden of production shifts, the burden of persuasion remains continuously with the plaintiff." *See id*.

Miller contends, with respect to Markowitz's failure to transfer claim, that "Markowitz cannot establish that Miller treated similarly situated employees who requested a transfer differently than it treated her when it denied her request to transfer her home office." (Def's Br. at 15-16.) Accordingly, Miller states that "Markowitz cannot establish a prima facie case and her claim should be dismissed." (Def's Br. at 17.) Because the court agrees that Markowitz cannot establish that Miller treated non-protected similarly situated employees differently than it treated Markowitz, the court will grant Miller's motion for summary judgment with respect to Markowitz's failure to transfer claim.

To meet her burden of demonstrating that another employee is "similarly situated," Markowitz must demonstrate that there is someone who is directly comparable to her in all material respects. *Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002). The Seventh Circuit Court of Appeals elaborated upon this requirement in a failure to transfer case involving a reduction in force ("RIF"):

In determining whether two employees are similarly situated a court must look at all relevant factors, the number of which depends on the context of the case. For example, in disciplinary cases – in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason – a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

*Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (citations omitted).

The courts finds that, at the very least, an employee similarly situated to Markowitz, but outside her protected class, would be a male SAM who requested a transfer to a location away from his client base and was granted such request by Stein during the relevant time period. Markowitz provides the court with no such individual.

Markowitz asserts that she is similarly situated to Paul Edwards, Ronald Schroeder, Ronald Freeman, Mark Denu, Kevin Gildea, Mark Neuwirth, and James Kallies, all of whom were male SAMs, who Markowitz alleges, like she, "engaged in significant travel that took them routinely from their residences to geographically diverse locations far from their homes." (Resp. at 20.) Notably, however, the plaintiff does not assert that the majority of the named male SAMs were treated differently than Markowitz. In order to establish her prima facie case, Markowitz needs to do more than simply establish that other employees were similarly situated to her. She must also establish that such similarly situated male employees were treated differently than she. With two exceptions, Paul Edwards ("Edwards") and Ron Freeman ("Freeman"), Markowitz fails to make such allegations. For the following reasons, the court is left unpersuaded that either Edwards or Freeman qualify as similarly situated male employees who were treated differently than Markowitz.

During the spring of 2003, after SAB's purchase of Miller, Edwards was working as a SAM covering the military accounts. (DPFOF ¶¶ 50-51.) After the merger, Stein decided to better cover

the military accounts and broke up those accounts within the National Accounts group. (DPFOF ¶ 50.) She gave the newly divided military accounts to three NAMs whose duties involved a "similar geographic footprint." (DPFOF ¶ 52)

Simultaneously, Stein wished to better cover the Young Adult part of the business. (DPFOF ¶ 54.) The only person within Stein's group, National Accounts, with experience in this area was Edwards. (DPFOF ¶ 56.) Accordingly, Edwards was asked to assume the Young Adults work and he agreed.[8] (DPFOF ¶ 57; Edwards Aff. at ¶ 2.)

It was determined that there were two geographic areas where Edwards could be located to work on Young Adults: Nashville, Tennessee and another location.[9] (DPFOF ¶ 59.) Stein concluded

---

[8] In her response to this particular fact, Markowitz responded, "Admit. Cited testimony of Mr. Colletti does not state this. Plaintiff objects to hearsay." (*See* Resp. to DPFOF ¶ 57.) After reviewing the portion of Mr. Colletti's deposition testimony cited by Miller, the court agrees with Markowitz that the cited passage does not support defendant's proposed finding of fact, paragraph 57, and in fact, the court finds the cited passage to be irrelevant to the fact at hand. However, Miller also cited a portion of Stein's deposition testimony, which upon review by the court, does support paragraph 57. Accordingly, the court will turn to Markowitz's hearsay objection.

"[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt*, 113 F.3d at 742. Hearsay is defined by Federal Rule of Evidence 801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Reviewing Stein's statement in light of Fed. R. Evid. 801(c), the court finds at least a portion of Stein's testimony to be hearsay, in that Stein, as the declarant, is testifying that Edwards made a statement agreeing to assume the Young Adults Division work, and Miller is offering Edwards' statement for its truth.

However, even though Stein's statement is hearsay, the court will admit the aforementioned fact because also in evidence before the court is Edwards' affidavit swearing that "[f]rom September 2003 until January 2008, I [Edwards] worked as an On-Premise Strategic Accounts Manager (SAM) in Nashville, Tennessee." (Edwards Aff. ¶ 2.) Presumably, in order to obtain such a job Miller had to at some point have offered Edwards the position and Edwards had to agree to accept it. Accordingly, as the relevant statement would not be considered hearsay if testified to by Edwards, and there is evidence before the court that he would testify to such an end, the statement of fact will be accepted as true by the court and admitted into evidence.

[9] In her response to this particular fact, Markowitz responded, "Admit that Stein testified to this fact. Deny the substance of this fact. Plaintiff objects to hearsay." (*See* Resp. to DPFOF ¶ 59.) For the reasons previously stated by the court (*supra* note 2 and accompanying text), Markowitz's denial of the substance of the fact is insufficient to overcome its admittance pursuant to Civil L.R. 56.2(b) without citation to evidence in the record. Accordingly, the court will address the merits of

22

that either location worked in terms of covering the Young Adult portion of the business. (DPFOF ¶ 60.) Soon thereafter, Edwards relocated to Nashville, Tennessee for personal reasons.[10] (DPFOF ¶¶ 61-62.)

Markowitz asserts that Edwards, a non-protected employee, was similarly situated to her in that he too was a SAM who traveled extensively and he too requested a transfer, allegedly away from his customer base; Markowitz alleges that Edwards was treated differently than she was in that Edwards' alleged request was granted. The only evidence Markowitz submits to the court indicating that Edwards made a transfer request, however, is Markowitz's own deposition testimony, in which she states she had the following conversation with Edwards:

> To the best of my recollection, that conversation was regarding how they moved him to Nashville so he could be close to his girlfriend that he was dating, who is now his wife, because that's where he wanted to be. He said that David Colletti and Regenia Stein worked on that for him and were able to make it so that his job could be based there. They were able to work it through for him.

---

Markowitz's hearsay objection.

"[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt*, 113 F.3d at 742. Hearsay is defined by Federal Rule of Evidence 801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

The court does not find Stein's statement to be hearsay in that the court does not accept the statement for the truth of the matter asserted, i.e., that there were only two geographic areas where Edwards could be located to work on Young Adults: Nashville, Tennessee and another location. Instead, the court admits Stein's statement as circumstantial evidence of Stein's beliefs or thoughts as to the geographic location where Edwards could work at the time he was hired for the Young Adults Division. 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 801.11[5][b] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2008) ("Testimony is not hearsay if it is offered only to show the context within which the parties had been acting, or to show a party's motive or intent for behavior.").

[10] In her response to this particular fact, Markowitz responded, "Admit, however, Ms. Markowitz stated that Mr. Edwards also told her that 'David Colletti and Regenia Stein worked on that for him and were able to make it so that his job could be based there. They were able to work it through for him.'" (Resp. to DPFOF at ¶ 62 (citing Markowitz Dep. at 42-42 [sic]).) Because Markowitz admits as true DPFOF ¶¶ 61-62, the court accepts such facts as true. The court does not admit into evidence Markowitz's citation to her deposition testimony because that testimony is hearsay. *See infra* p. 24.

23

(Ex. A at 41; PPFOF ¶ 44.)

Unfortunately for Markowitz, her submitted evidence is hearsay and does not fall within an exception to the hearsay rule. *See* Fed. R. Evid. 801(c). Because the court cannot consider hearsay evidence on motion for summary judgment, Markowitz provides the court with no admissible evidence that Edwards ever requested such a transfer. *See Eisenstadt*, 113 F.3d at 742 ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial."). Furthermore, Edwards' affidavit filed in support of Miller's motion for summary judgment contradicts Markowitz's testimony as to what Edwards told Markowitz about his transfer. Edwards stated that:

> Before Markowitz's employment ended, she pulled me aside after a lunch at the last staff meeting she attended. She questioned me on my move to Nashville. I told her it was based on the call coverage and being close to customer [sic]. She said she was moving to Maryland because she was engaged to be married. I told her she needed to make a business case for the transfer. She said that one of her customers was located there. I said that I did not think that would be enough . . . I did not tell Markowitz during this or any other conversation that Regenia Stein or David Colletti moved me to Nashville so I could be close to my then girlfriend (now wife), although I did indicate that the relocation worked out so I could be close to my girlfriend.

(Edwards Aff. at ¶¶ 7-8.) With no admissible evidence to support her allegations that Edwards requested and was granted a transfer, Markowitz cannot establish that Edwards is a non-protected similarly situated employee who was treated differently than she.

Markowitz also alleges that Freeman was allowed to relocate for personal reasons. (Resp. at 20.) However, Markowitz fails to elaborate upon her claim. The evidence before the court shows that Freeman was a SAM based out of St. Louis from 2002-2007. (Freeman Aff. ¶ 3.) There is some indication that during that time Freeman's main accounts may have been located in Dallas, Texas. (Ex. D at 135-36; Freeman Aff. ¶ 3.) Freeman applied for and was selected to work as a SAM handling casinos in January 2007. In March 2007, Freeman moved from St. Louis to Las Vegas

24

where the casino account's headquarters are based. (Freeman Aff. ¶ 5.)  The court fails to see how any of this information, even construed in the light most favorable to plaintiff, indicates that Freeman was a similarly situated employee treated differently than Markowitz.  At no point does anyone suggest that Freeman requested a transfer to another location outside his market area and was granted such request.  The only geographical move Freeman made between 2002 and 2007 was from St. Louis to Las Vegas.  The facts show that Freeman applied for the Las Vegas position and therefore did not make a transfer request.  Because there is no evidence on the record that Freeman ever requested and was granted a transfer by Stein, he cannot be considered a non-protected employee, similarly situated to Markowitz, but treated differently.

Because Markowitz has not established that she can assert a prima facie case of discrimination with respect to her failure to transfer claim, the court will grant the defendant's motion for summary judgment with respect to that claim.

Markowitz must also establish a prima facie case of discrimination in regards to her discriminatory discharge claim.  Again, she does not do so.

As part of establishing her prima facie case of discrimination in her discharge from Miller, Markowitz must show that she suffered an adverse employment action at the hands of Miller. Markowitz asserts that "termination" is an adverse employment action.  While the court agrees that termination of employment is an adverse employment action, the court does not find that Markowitz has established that Miller terminated her employment.  *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.").

Miller asserts that it did nothing more than deny Markowitz's transfer to Maryland. Miller states that "Markowitz's last day working for Miller as a SAM was April 27, 2005. On April 28, 2005, the SAM job that Markowitz had been performing for Miller in San Antonio until April 27, 2005 was available and open to Markowitz." (Def's Br. at 19.) Markowitz contends that the job was not open to her after April 27, 2005 because she did not intend to remain in Texas and the job would not be open to her in Maryland. (Resp. to DPFOF ¶ 191.)

By letter dated March 16, 2005, before her final day as a Miller employee, Markowitz sent a letter to Jewell outlining her particular concerns with her current employment in hopes of resolving them before "seek[ing] a third party to intervene." (Ex. 1017 at 1.) In conclusion, Markowitz wrote,

> I would hope that your consideration of the factors aforementioned merit your careful review and scrutiny that will result in a positive step towards our conflict resolution. I ask for one year's severance pay, vacation pay earned for the 2005 calendar year and FY05 volume bonus. In exchange, I am more than willing to sign a full and total release that will abdicate Miller from any further responsibility to our employment agreement.

(Ex. 1017 at 2.) The tone and tenor of such a letter certainly indicates to this court that Markowitz intended to resign her position if Miller did not transfer her SanAntonio SAM position to Maryland. Miller, apparently, felt the same way because on April 18, 2005 Jewell told Markowitz that if she moved to Maryland her current position would remain in San Antonio, and on April 27, 2005, Markowitz received another letter from Jewell purporting to be an acceptance of her resignation from Miller. At the end of April 2005, Markowitz moved to Maryland.

Markowitz seems to argue that in not transferring her SAM position to Maryland Miller effectively terminated her employment. However, as previously established, Markowitz has failed to show that Miller's decision not to transfer her current position to Maryland was discriminatory in nature. Further, Markowitz does not allege that she could not have continued on as a SAM had she remained living in San Antonio. Because this court finds that Markowitz could have remained

working as a SAM in San Antonio and that she effectively resigned when moving to Maryland, the court must conclude that Markowitz cannot show that Miller engaged in a adverse action against her.

In an off-handed comment in her response brief, Markowitz states that "a jury could find that a constructive discharge took place." (Resp. at 17.) Markowitz fails to elaborate upon or develop this argument, and Miller contends that it therefore has been waived. (Reply at 14.) Even after careful consideration of the argument, however, the court does not find a jury could find a constructive discharge to have taken place.

"To establish 'constructive discharge,' the plaintiff must . . . show that [an] abusive working environment became so intolerable that her resignation qualified as a fitting response." *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004). The court usually sees such claims in conjunction with hostile work environment claims. *See id.* at 133-34. The plaintiff "concedes that hostile work environment based upon her gender, for the purposes of this opposition, is not classically so severe or pervasive as to Colletti's actions to be sufficient to support such a claim." (Resp. at 21.) However, the showing a plaintiff must make to establish a constructive discharge claim is *greater* than that required to establish a hostile work environment claim:

> To establish hostile work environment, plaintiffs . . . must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [their] employment." . . . to establish "constructive discharge," the plaintiff must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response.

*Suders*, 542 U.S. at 133-34. Because the plaintiff concedes that she could not establish a hostile work environment claim, by default she also cannot establish a constructive discharge claim. Therefore, Miller's motion for summary judgment with respect to Markowitz's discriminatory discharge claim will be granted.

27

A substantial portion of the plaintiff's filings in opposition to the defendant's motion for summary judgment were dedicated to attacking Miller's purported reasons for denying Markowitz's transfer request in an attempt to prove that such reasons were pretextual. However, in doing so, the plaintiff places the cart before the horse. As stated by the Seventh Circuit Court of Appeals:

> While it might be tempting to take the "sensible" shortcut by jettisoning the *prima facie* analysis altogether and moving directly to the pretext inquiry, this circuit does not endorse such a practice. We have consistently held that "the *prima facie* case under *McDonnell Douglas* must be established and not merely incanted." If a plaintiff is unable to establish a *prima facie* case of employment discrimination under *McDonnell Douglas*, an employer may not be subjected to a pretext inquiry.

*Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 327 (7th Cir. 2002) (internal citations omitted). Accordingly, because the plaintiff has not established a prima facie case of discrimination, the court need not address her arguments as to pretext.

**NOW THEREFORE IT IS ORDERED** that the defendants motion for summary judgment be and hereby is granted (dkt # 43);

**IT IS FURTHER ORDERED** that this action be **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that the Clerk of Courts enter judgment accordingly.

**SO ORDERED** this 11th day of June 2008, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge